UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

CHRISTOPHER FUNDARO,

                 Petitioner,            Case Number 4:13-cv-11868
                                                        Honorable Terrence G. Berg

CINDI CURTIN,

                 Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS**

This matter is before the Court on Petitioner Christopher Fundaro's petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. Petitioner was convicted in the Oakland Circuit Court of first-degree murder and was sentenced to mandatory life imprisonment. *See* MICH. COMP. LAWS § 750.316. The petition raises a single claim: Petitioner's statement to the police was rendered involuntary by a representations made by the interrogating officers that Petitioner acted in self-defense. The Court finds that Petitioner's claims are without merit. Therefore, the petition will be denied. The Court will also deny Petitioner a certificate of appealability and deny permission to proceed on appeal in forma pauperis.

## I. Facts and Procedural History

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

The prosecution charged Fundaro with felony-murder arising from the stabbing death of John Cox at his store, Three Doors Down, in Pontiac, Michigan. Cox's wife testified that Three Doors Down was a small boutique located in a strip mall. Cox mostly catered to young adults; he sold T-shirts, jewelry, handbags, tie-dye, and posters. She stated that Cox usually started the day with $150 in the register.

Geno Clemmons testified that he knew Fundaro and that for a time he let Fundaro stay at his home. However, the living arrangements did not work out and he told Fundaro to leave in October 2009. Clemmons admitted that he had used drugs in the past and that he had a criminal record.

Clemmons stated that on October 22, 2009, his girlfriend drove him to the gas station near the strip mall where Three Doors Down was located; they went there for gas and cigarettes. He said that, as he got out, he noticed Fundaro "in front of the gas station kind of pacing." Fundaro "approached me and said he had a lick to hit...." Clemmons understood that Fundaro was asking him to participate in the robbery, but he refused and they went their separate ways. Clemmons said it was between 2:30 and 3:30 in the afternoon.

Hikmat Jajo testified that he was working at the dollar store located a few doors from Cox's store when, at around 5:30 pm., a man came into his store and told him to call the police, but did not explain why. He followed the man after he left his store and saw him standing in front of Three Doors Down. Jajo said he went down to Three Doors Down and looked into the store; he saw a man lying face down with "his shirt up and most of his stuff on the floor." He returned to his store and called the police. The police arrived in just a few minutes.

Raymond Wiggins testified that he was a patrol officer and that he went to Three Doors Down after receiving a "man down" call at 5:30 pm. When he arrived, he saw a man lying face down in a pool of blood with a hammer under his left arm. He said the man did not appear to be breathing and "was already turning [bluish], purplish in the face." The store's items had also been tossed about as if there had been a struggle. Other testimony established that the store's cash register was found on the floor, broken, and with no paper currency in it.
An expert pathologist testified that Cox had been stabbed nine times, which included five stabs to his back. One of the stabs to Cox's back penetrated his thoracic cavity and went into his lung; this stab wound was fatal.

Brian McLaughlin testified that he was a patrol sergeant and that he responded to Three Doors Down. He received information that there were two possible suspects: one dressed in blue and the other in gray and balding. McLaughlin sent an officer, Craig Pesko, into a nearby high-crime neighborhood to canvass for the suspects.

Pesko testified that he had driven into the nearby neighborhood when one of his dogs began to bark. He looked and saw a man wearing a gray hooded sweatshirt walking between a fence and a garage. The man appeared to be bald. Pesko got out of his car and went to the fence line; the man was gone, but he saw a nearby apartment building and observed the man on the other side of a fence surrounding the apartment. Pesko followed the line of the man's path, but lost sight of him. Pesko then searched a nearby open parking lot and discovered the man, later identified as Fundaro, hiding under a trailer. He took Fundaro into custody and turned him over to McLaughlin. Pesko said that the parking lot was around two blocks from Three Doors Down.

McLaughlin said that he drove to Pesko's location after Pesko radioed that he had taken a suspect into custody. McLaughlin patted Fundaro down and found $171 in cash in his front pocket: four twenties, seven tens, one five and sixteen ones. He said that the cash was in order and folded; he also said that Fundaro did not have any cash in his wallet. McLaughlin also found two cell phones. When he opened one of the cell phones, a "Three Doors" banner appeared on the screen.

Cox's wife testified that Cox was supposed to pick up their fifteen-year-old daughter from school at 7:30 that night. When her husband and her daughter had not arrived home by 8:15 pm., she became worried and called her daughter. Her daughter told her that "Dad hasn't picked me up yet." So Cox's wife called his cell phone and a detective answered. Although reluctant to speak over the phone, the detective eventually admitted that her husband was dead.

Detective Sergeant Steven Troy testified that he and detective Steven Wittebort interrogated Fundaro after he was brought into custody. Fundaro admitted that he spoke with Clemmons at the gas station, but denied that he had anything to do with Cox's death. Fundaro told him that a woman paid him some cash that she owed him earlier that day and that he had found Cox's cell phone.

Troy said that, because Fundaro was not responding well to their questioning, they decided to bring in an officer from the auto-theft

unit, Peter Mistretta. Mistretta was investigating an auto theft with which Fundaro might have been involved. He explained that he thought Fundaro might respond better to Mistretta because he had worked undercover and "has a different look": he has "long hair" and wears a "goatee." He said that Mistretta was also a very good interviewer. After Mistretta arrived, Troy watched the interview on video from another room.

Mistretta testified that Troy called him and that he came over to interview Fundaro about the auto theft. After Fundaro admitted that he stole the car, the conversation turned to Cox's death. Mistretta said that Fundaro eventually admitted that he killed Cox:

> His intent was to go in and rob him. He was inside the store for about ten minutes just looking around. There was small talk between him and [Cox].
>
> And then he stated that [Cox] came at [him] with [a] claw [hammer] and [Cox] just went crazy—pretty much is what he said—and came at him swinging at him with a hammer and trying to [hit] him with the hammer.
>
> And [they] wrestled and knocked stuff down in the small area which apparently is real small according to him. There was just a counter top in this real small store and that was a mess.
>
> And that he just kept—he stabbed him, is what he told me.

The prosecution also moved for the admission of the video of Fundaro's interview and the trial court had it played for the jury.

In closing, Fundaro's lawyer did not contest that Fundaro killed Cox; rather, he argued that the evidence showed that Fundaro only killed Cox after Cox attacked him. On that basis, he argued that the jury should find Fundaro guilty of voluntary manslaughter, not felony-murder. The jury rejected this argument and found Fundaro guilty of felony-murder.

*People v. Fundaro*, No. 301194, 2012 WL 247759, at *1-3 (Mich. Ct. App. Jan. 26, 2012).

-4-

Based on this evidence the jury found Petitioner guilty, and he was subsequently sentenced as indicated above.

Following his conviction and sentence, Petitioner filed a direct appeal in the Michigan Court of Appeals, raising the following claim:

> I. Did the trial court commit reversible error in denying the pre-trial defense motion to suppress defendant's custodial statement to the police, as the Walker hearing record demonstrates that the statement was rendered involuntary and coerced and obtained in part as a result of misrepresentations and, essentially, legal advice by police to secure incriminating statements, contrary to the rights guaranteed defendant under U.S. Constitution, Amendments X, XIV; and Constitution 1963, Art. I §§ 17, 20?

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *Id.* Petitioner then filed an application for leave to appeal in the Michigan Supreme Court, raising the same claim. The Michigan Supreme Court denied the application because it was "not persuaded that the questions presented should be reviewed by" it. *People v. Fundaro*, 815 N.W.2d 445 (Mich. 2012) (table). Petitioner then commenced the present action.

## II. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the

state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

  Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Id.*, at 786-787.

### III. Analysis

Petitioner's sole claim is that the statements he made to police after his arrest were involuntary and should have been suppressed because the interrogating officers misrepresented the consequences of admitting to the homicide. He claims that the officers told him that his conduct constituted self defense and therefore he did not have anything to worry about by cooperating. The trial court held an evidentiary hearing on the claim in which the officers in question and Petitioner testified. After the hearing, the trial court issued an opinion finding that Petitioner's confession was voluntary and a product of his own free will. The Michigan Court of Appeals upheld this decision. Respondent argues that the state court adjudication of Petitioner's claim reasonably applied the established Supreme Court standard, and therefore habeas relief is not warranted.

Whether or not a defendant has been given and waived his *Miranda* rights, the Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). If a defendant has been advised of his rights, however, and voluntarily waived them, it will be difficult to claim that his confession was nonetheless involuntary. *Loza v. Mitchell*, 766 F.3d 466, 478 (6th Cir. 2014) (citing *Missouri v. Seibert*, 542 U.S. 600, 609 (2004) (plurality opinion) (noting that maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina)).

The test for the voluntariness of a statement to the police is whether

> the confession [is] the product of an essentially free and unconstrained choice by its maker[.] If it is, if [the suspect] has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). When determining whether a defendant's will was overborne in a particular case, courts must assess "the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation." *Id.* at 226 (citations omitted).

> Those potential circumstances include not only the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health. They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation.

*Withrow v. Williams*, 507 U.S. 680, 693-694 (1993) (citations omitted). "In a federal habeas action, the burden of proving that the confession was involuntary rests with the petitioner." *Boles v. Foltz*, 816 F.2d 1132, 1136 (6th Cir. 1987) (citing *Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980)). "[V]oluntariness need only be proven by a preponderance of the evidence." *Id.* (citing *Lego v. Twomey*, 404 U.S. 477 (1972)).

Here, the evidence presented at the pretrial hearing indicted that Petitioner was informed of and waived his *Miranda* rights. Petitioner did not contest that he told the officers that he was willing to talk to them after he was read his rights, and he did not claim that he invoked his right to cut-off questioning during the

interview. Petitioner was familiar with the criminal justice system and police questioning, having been involved with investigations from 2007-2009.

The officers participating in the interview denied that they made any threats or promises to Petitioner in exchange for his cooperation. Petitioner appeared to the officers to be coherent, understood what was happening, and answered questions logically. During the initial interview by Sergeants Troy and Wittebort, which lasted from 7:45 p.m. until 9:00 p.m., Petitioner denied any involvement at all in the death of the victim. The officers suggested that perhaps the victim attacked him because a hammer was found near his harm.

After the first round of questioning did not produce anything incriminating, the officers changed tactics and had another officer, Detective Mistretta, from the vehicle theft division, take over questioning. They believed that Petitioner would better relate to the rougher appearance and easy-going demeanor of this detective.

Mistretta reminded Petitioner of his rights, and Petitioner did not indicate that he wished to invoke them. It did not appear to him that Petitioner was under the influence of a controlled substance, and it appeared to him that Petitioner understood the questions. Mistretta denied that he promised Petitioner anything in exchange for his cooperation.

Mistretta quickly obtained a confession regarding an automobile theft, and then he turned the conversation towards the homicide. After further denials, within 45 minutes Petitioner admitted that he was involved in the homicide. Petitioner said that the other officers were trying to get him for murder, and he said

-10-

he was going to prison because they would never accept a claim of self-defense.

Mistretta replied:

Why? What do you mean it's not self-defense? If you come at me with a hammer right now, what do you think, I'm going to sit here? It's self defense.

Dkt. No. 7-3, p 90.

Mistretta told Petitioner that he did know anything about the facts of the homicide. He explained that he was telling Petitioner that he should cooperate because if he didn't, then the officers would not hear his side of the story and consider that Petitioner may have acted in self-defense. Petitioner then claimed that the shop owner came at him with a hammer so he stabbed him in self-defense.

Petitioner testified that he had used heroine on the morning before his questioning and he was still feeling it during the interview. He explained that he was sick, nauseated, tired, and hungry at the time. Eventually, he felt like the officers told him that what he did was not wrong, so he explained what happened.

The record supports that state court's decision that Petitioner's statement to the police was voluntary. "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda 's* concerns." *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990); *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding that police misrepresentation of facts, while relevant, was insufficient to render an otherwise voluntary confession inadmissible). So while it is true that a promise of leniency can render a confession coerced depending on the totality of the circumstances, *United States v. Stokes*, 631

F.3d 802, 808 (6th Cir. 2011), here there was no promise of leniency made to Petitioner. The officers merely informed defendant that if what he did was self-defense then it was in his best interests to say so. While Petitioner testified that he understood the officers to be saying that he did nothing wrong, their testimony shows that they made no such representation. Rather, the statements were conditional: *if* Petitioner acted in self-defense, *then* he should explain his side of the story. The statements did not inform him that he in fact acted in self-defense. In light of this, Petitioner's choice to give his version of events was reasonably construed by the state courts to be the product of an essentially free and unconstrained choice by Petitioner. *Schneckloth,* supra. The police did not promise Petitioner that his story would exonerate him, only that the interview was his opportunity to share it. The state court decision that Petitioner's statement was voluntary therefore did not constitute an unreasonable application of the established Supreme Court standard.

## IV. Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  When a district court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*,

529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id*. at 336-37. The Court concludes that a certificate of appealability is not warranted in this case because reasonable jurists could not debate the Court's assessment of Petitioner's claims. The Court will also deny Petitioner permission to proceed on appeal in forma pauperis because an appeal could not be taken in good faith.

## V. Conclusion

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that permission to proceed on appeal in forma pauperis is **DENIED**.

  s/ Terrence G. Berg
Honorable Terrence G. Berg
United States District Judge

Dated: January 26, 2015